**NORTON ROSE FULBRIGHT US LLP**
Thomas J. Hall
Howard S. Beltzer
Eric Daucher
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100

*Counsel for Applicant The Steering Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application Pursuant to 28 U.S.C. § 1782 of<br><br>Coöperatieve Rabobank U.A.; Credit Agricole Corporate and Investment Bank; ING Bank N.V.; the International Finance Corporation; Natixis, New York Branch; and Nederlandse Financierings-Maatschappij Voor Ontwikkelingslanden N.V.<br><br>For an Order to Conduct Discovery for Use in Foreign Proceedings. | Case No. 20-mc-244 |

**MEMORANDUM OF LAW IN SUPPORT OF STEERING**
**COMMITTEE'S SECOND *EX PARTE* APPLICATION FOR**
**JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Preliminary Statement ..................................................................................................... 2

Background ..................................................................................................................... 3

    I.      The Nature of Vicentin's Business ................................................................. 3

    II.     The Steering Committee's Involvement with Vicentin ......................... 6

    III.    Vicentin's Abrupt Collapse and Vanishing Value ................................. 8

Nature of Evidence Sought and Relief Requested ..................................................... 16

Argument ..................................................................................................................... 17

    I.      Standard for Granting Relief ....................................................................... 17

    II.     The Steering Committee's Application Meets all of the Statutory Requirements for Discovery Pursuant to 28 U.S.C. §1782 ................................................................ 19

         A.    The Respondent Institutions Reside or Can be Found in this District ...... 19

         B.    The Discovery Sought is for Use in a Proceeding Before a Foreign Tribunal ................................................................................................................. 22

         C.    The Members of the Steering Committee are "Interested Parties" for Purposes of 28 U.S.C. § 1782 ............................................................................ 24

    III.    The Relevant Discretionary Factors also Weigh in Favor of Granting Discovery 25

Conclusion ................................................................................................................... 27

# TABLE OF AUTHORITIES

Cases

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) ...........................................22

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76 (2d Cir. 2012) .........19, 23

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 37 S. Ct. 1773 (2017) ........................21

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d. Cir. 2015) ... 24, 25

*Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD)(SN) 2018 WL 3536083 (S.D.N.Y. July 23, 2018) ................................................................................................................23

*Gushlak v. Gushlak*, 486 F. App'x 215 (2d Cir. 2012) ......................................................1

*In re Application of Fernando Celso De Aquino Chad*, No. 19-mc-261 2019 WL 2502060 (S.D.N.Y. June 27, 2019) ...............................................................................................28

*In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ......................................................................20

*In re Application of Maria Ester Tabak*, No. 18-mc-00221 (PGG) (S.D.N.Y. July 1, 2018) ...... 28

*In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925  (S.D. Fla. June 12, 2012) .29

*In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019) ................................................19, 20, 21

*In re Edelman*, 295 F.3d 171 (2d Cir. 2002) ....................................................................19

*In re Godfrey,* 526 F. Supp. 2d 417 (S.D.N.Y. 2007) .......................................................20

*In re Hornbeam Corp.*, 722 F. App'x 7 (2d Cir. 2018) .....................................................25

*In re Iraq Telecom Ltd.*, No. 18-MC-458 (LGS) (OTW), 2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019) ...........................................................................................................................28

*In re Sargeant*, 278 F. Supp. 3d 814 (S.D.N.Y. 2017) .....................................................26

*In re Top Matrix Holdings Ltd.,* No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ......................................................................................................................24, 25

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241  (2004) ........................ passim

*Lancaster Factoring Co. v. Mangone*, 90 F.3d 38 (2d Cir. 1996) ...............................24, 26

*Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6 (2d Cir. 2014)..............18

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129 (2014).....22

*Mees v Buiter*, 793 F.3d 291 (2d Cir. 2015) ...............................................................18, 19

*Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456 (2d Cir. 2014).........................18, 27

**<u>Statutes</u>**

28 U.S.C. § 1782.................................................................................................................. 12, 13

Coöperatieve Rabobank U.A. ("Rabobank"); Credit Agricole Corporate and Investment Bank ("CACIB"); ING Bank N.V. ("ING"); the International Finance Corporation ("IFC"); Natixis, New York Branch ("Natixis"); and Nederlandse Financierings-Maatschappij Voor Ontwikkelingslanden N.V. ("FMO" and, collectively with Rabobank, CACIB, ING, IFC, and Natixis, the "Steering Committee") respectfully submit this memorandum of law in support of their second *ex parte* application (the "Application") for an Order, pursuant to 28 U.S.C. § 1782 ("Section 1782"), for leave to serve The Clearing House Payments Company L.L.C. (the "Clearing House"), a number of financial institutions listed on Exhibit A to the Declaration of Guillermo Jorge submitted herewith (the "Jorge Declaration") that regularly act as intermediary or correspondent banks with respect to US dollar-denominated transactions (collectively with the Clearing House, the "Intermediary Institutions"), and a number of financial institutions listed on Exhibit P to the Jorge Declaration at which relevant bank accounts are held (the "Account Banks" and, together with the Intermediary Institutions, the "Respondent Institutions") with subpoenas in connection with an in-court restructuring proceeding (*concurso preventivo*) initiated by Vicentin S.A.I.C. ("Vicentin" or the "Company") before an Argentine court and other proceedings that are contemplated to be commenced in the near future before courts located outside the United States in respect of Vicentin and certain of its affiliated entities and/or individuals.[1]

---

[1]   District courts may, and indeed typically do, grant relief under Section 1782 on an *ex parte* basis.   *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash [a subpoena] pursuant to Federal Rule of Civil Procedure 45(c)(3).").

## PRELIMINARY STATEMENT

The Steering Committee once again seeks this Court's assistance in obtaining financial records that are uniquely available in this District, and which are necessary to get to the truth of a situation that bears all of the hallmarks of major international financial impropriety. The Steering Committee is a group of financial institutions that are collectively owed approximately US$500 million that they loaned to Vicentin, a large (and now insolvent) Argentine agribusiness. Until late 2019, Vicentin was providing members of the Steering Committee financial records that reflected robust performance and financial health: ample reserves of raw materials and finished goods, positive cash flow from operating activities, minimal trade payables, and hundreds of millions of dollars of equity value. Then, in December 2019, and without prior warning or explanation, Vicentin financially collapsed, shutting down its operations. In doing so, Vicentin revealed that it not only lacked the ample reserves it had previously declared, but actually owed approximately US$400 million to its raw materials suppliers—*i.e.*, Argentine farmers and grain traders.

The immediate market reaction to Vicentin's abrupt failure was confusion. Were the Company's accounts overstated all along? Was it improperly stripped of assets? Was something else amiss? Despite seeking insolvency protection under Argentine law, the Company has failed to provide information that would give its stakeholders clear answers to any of these questions.

The Steering Committee—which is comprised of the Company's largest international lenders—stepped into the breach with the goal of answering these questions. Critically, Vicentin's major transactions—like its debt—were dollar-denominated, meaning that they often physically cleared through banks in this District. The Steering Committee therefore filed an initial application pursuant to Section 1782 in February 2020 seeking wire transfer records related to Vicentin and a number of its known or suspected affiliates, all with the goal of learning precisely what became of

Vicentin's seemingly substantial resources.  Thanks to this Court's granting of that initial application, and the cooperation of the subpoenaed financial institutions in this District, the Steering Committee has learned a tremendous amount about Vicentin's conduct over the last three years, much of it very troubling.

As an initial matter, the Steering Committee has found ***nothing*** that could legitimately bridge the gap between the Company's representation that it was financially sound in mid-2019 and its collapse in December 2019.  All indications are that the company's mid-2019 financial statements were simply false.

The Steering Committee has, however, uncovered hundreds of millions of dollars of transfers from the Company and its branches and subsidiaries to other companies owned by Vicentin's shareholders—companies in which Vicentin has no interest—apparently without consideration of any kind.  These transfers may represent an ongoing effort to siphon cash from Vicentin's grain-trade business to support other enterprises controlled by Vicentin's shareholders, free from the claims of the Company's creditors.  If proven, these "tunneling" activities very well may amount to a criminal offense under Argentine law.

The Steering Committee has not yet gotten to the bottom of the reasons for Vicentin's collapse.  But thanks to this Court's initial order, the pieces of the puzzle that was Vicentin's collapse are starting to fall into place.  The Steering Committee now requests further assistance, principally to continue to follow the flow of certain funds that, thanks to the initial round of discovery, it has already traced out of the Company and into sister companies owned by Vicentin's controlling families.

## **BACKGROUND**

Support for the factual statements set forth in this background section is contained in the Jorge Declaration, including the Exhibits thereto.

I.      **The Nature of Vicentin's Business**

Vicentin is a large, family-owned Argentine business founded in 1929. Until very recently, Vicentin operated one of Argentina's largest agro-industrial businesses.[2]

The Company has frequently been described as a "major player" in the Argentinian soy market—an area in which it has been active since the 1970s. The Company managed four major soybean crushing facilities in Argentina—Renova (Vicentin's current share of that entity's crushing capacity is approximately 9,000 tons per day), Ricardone (crushing capacity of approximately 4,350 tons per day), and two plants at San Lorenzo (combined crushing capacity of approximately 16,650 tons per day)—making the company one of the largest oilseed crushers in the country as measured by capacity. Vicentin's overall share of the crushing market in Argentina—which itself accounts for approximately 17% of the total global soybean crushing capacity—was substantial, and typically ranged between 11% and 15%.

In addition, Vicentin managed two port terminals in Argentina's Greater Rosario Area, where the overwhelming majority of Argentina's soybean production (approximately 93%) and soybean crushing (approximately 95%) takes place.

In 2007, the Company also opened biodiesel plants in Argentina and became one of the main participants in Argentina's biodiesel sector. Thereafter, Vicentin continued to expand its agricultural product offerings, adding refined glycerin and ethanol production capabilities at its Renova and Avellaneda facilities.

Vicentin's apparent "crown jewel" asset was a 50% interest (33% directly held and 16.67% indirectly through its subsidiary, Vicentin Paraguay S.A.) in Renova S.A. ("Renova"), a 50-50

---

[2]   Vicentin is currently not operating, and therefore, will generally be referred to herein in the past tense, although its future remains in question.

joint venture with Oleaginosa Moreno S.A., a wholly-owned indirect subsidiary of Switzerland-based Glencore plc ("Glencore").  Begun in 2006 with an agreement to construct Argentina's first biodiesel from soybean oil plant, Renova expanded over time to become one of the most efficient oilseed crushers in the world, coupled with one of the largest biodiesel production facilities in Argentina, an integrated 30 megawatt co-generation plant, and its own port facilities.  In 2017, Renova began to expand still further with the construction of a new grain port, a barge terminal, and additional storage capacity.

The overwhelming majority of Vicentin's sales were driven by exports out of Argentina. For example, Vicentin reported that, in 2018, approximately 87.3% of Vicentin's revenues were derived from exports.[3]  In its third quarter 2019 financial statements, Vicentin reported that approximately 91.8% of its revenues were derived from exports.[4]  Those transactions were primarily denominated in US dollars and, as a result, the Company has treated US dollars as its functional currency.[5]

In sum, Vicentin was, by any measure, a major Argentine agribusiness enterprise engaged in substantial dollar-denominated sales.

## II.    **The Vicentin Family Group**

An extended group of companies, which is believed to be owned and controlled by the same families that own and control Vicentin itself, also has significant activities in the agriculture, agricultural products, and textiles fields.

---

[3]    *See* Jorge Declaration Exhibit L.

[4]    *See* Jorge Declaration Exhibit I at 21, n. 20.

[5]    *See* Jorge Declaration Exhibit I at 2, n. 4.

Between 2014 and 2017, that extended group of companies underwent a reorganization process with the objective of isolating the core grain-trade business of Vicentin and its current subsidiaries from its shareholders' "non-core" businesses in the cotton, wine, dairy, and meat industries.  As a result of this reorganization process, as of 2017, Vicentin no longer controls those separate enterprises (directly or indirectly), which are instead now owned by Vicentin Family Group S.A. ("Vicentin Family Group"), a separate legal entity that is believed to be controlled by Vicentin's shareholders.  Moreover, the reorganization was intended to financially separate Vicentin from the cotton, wine, dairy, and meat businesses now owned by Vicentin Family Group. Consequently, following the completion of the reorganization, transactions between Vicentin and those businesses should have been eliminated or at least decreased.  Any continuing transactions should have complied with arm's-length principles.  Unfortunately, and as discussed below, it appears that Vicentin's controlling families continued to use Vicentin's cash to financially support their Vicentin Family Group businesses, in which Vicentin itself no longer had a material interest.

## III.   The Steering Committee's Involvement with Vicentin

Consistent with industry practice, Vicentin traditionally financed its substantial working capital needs through short-term renewable credit lines.  Credit was traditionally extended to Vicentin by a wide range of both local and international banks and financial institutions.

The Steering Committee is Vicentin's largest creditor constituency, and consists of international financial institutions that are collectively owed, either directly as lender of record or indirectly as loan participants, approximately US$500 million by Vicentin.  These loans were extended through a number of different facilities (collectively, the "SteerCo Facilities").  The principal SteerCo Facilities are as follows:

- *The "IFC A/B Facility":* An approximately US$292.5 million principal amount facility, entered into as of December 19, 2017, divided into an A-tranche (US$35 million), B-1 tranche (US$185.5 million), and B-2 tranche

(approximately US$72 million), all of which are secured by Vicentin's receivables under certain "Eligible Export Contracts" relating to its crushing operations. IFC is the lender of record under the IFC A/B Facility, while Natixis acts as collateral agent.[6] Approximately US$265.5 million principal is currently outstanding under the IFC A/B Facility.

- *The "FMO A/B Facility":* A US$150 million pre-export finance term loan facility, entered into as of May 10, 2019, divided into an A-facility (US$45 million) and a B-facility (US$105 million). FMO acts as agent for the FMO A/B Facility, while Natixis acts as collateral and security agent. Approximately US$150 million remains outstanding under the FMO A/B Facility.[7]

- *The "ING Facility":* A pre-export finance facility, entered into as of March 28, 2017, with a maximum committed availability of US$115 million. ING acts as facility agent, security agent, and sole coordinator. Approximately US$71.9 million is currently outstanding under the ING Facility.[8]

- *The "Natixis Facility":* An uncommitted pre-export finance facility, entered into as of January 11, 2017, with a maximum facility amount of US$30 million. Natixis acts as the bank under the Natixis facility. Approximately US$10 million is currently outstanding under the Natixis Facility.[9]

- *The "Rabobank Facilities":* Two uncommitted pre-export finance facilities, entered into as of January 11, 2017 and August 5, 2015 (amended May 17, 2019), with a combined maximum facility amount of US$23 million. Rabobank acts as the lender under the Rabobank Facilities. Approximately US$23 million is currently outstanding under the Rabobank Facilities.[10]

Notably, the SteerCo Facilities were all entered into after the commencement of the restructuring of the businesses controlled by the families that control Vicentin and contain covenants that require the continued separation of Vicentin and its subsidiaries from the businesses of the Vicentin Family Group. Generally, the SteerCo Facilities specifically require that Vicentin conduct related party transactions—including transactions with entities owned by the Vicentin

---

[6]   *See* Jorge Declaration Exhibit C.

[7]   *See* Jorge Declaration Exhibit D.

[8]   *See* Jorge Declaration Exhibit E.

[9]   *See* Jorge Declaration Exhibit F.

[10]   *See* Jorge Declaration Exhibits G and H.

Family Group—only on an arm's-length basis and in accordance with sound industry, financial, and business practices. For example, the IFC A/B Facility requires annual certification by Vicentin "that all transactions between [Vicentin] and/or its Subsidiaries and each of their respective Affiliates, if any, during the Financial Year, were on the basis of arm's-length arrangements . . . ."[11]

## IV.    Vicentin's Abrupt Collapse and Vanishing Value

Vicentin agreed to various financial covenants in the SteerCo Facilities, as well as various financial reporting requirements for demonstrating its covenant compliance. For example, pursuant to Section 5.03(a) of the agreement governing the IFC A/B Facility, Vicentin was required to:

> As soon as available but in any event within 60 days after the end of each Financial Quarter other than any Financial Quarter ending October 31 (or in the case of the Financial Quarter ending January 31, 120 days), deliver to IFC:
>
> (i) the Borrower's complete financial statements for such quarter prepared, on a Consolidated Basis, in accordance with the Accounting Standards and on a basis consistent with the Borrower's audited financial statements, in each case, certified by the Borrower's chief financial officer; and
>
> (ii) a report (in a form pre-agreed by IFC), signed by the Borrower's chief executive officer, chief financial officer or any 2 members of the Board or 1 member of the Board and 1 attorney in fact, concerning compliance with the financial covenants in this Agreement....[12]

Vicentin was likewise obligated to notify the members of the Steering Committee of any actual or potential events of default under its loan documents (including actual or potential

---

[11]    *See* Jorge Declaration Exhibit C § 5.03(b)(v).

[12]    *See* Jorge Declaration Exhibit C § 5.03(a).

breaches of its financial covenants)[13] as well as any anticipated changes to Vicentin's business or operations that could reasonably be expected to have a material adverse effect.[14]

Through its third quarter 2019 financial reporting period, Vicentin reported robust financial performance to members of the Steering Committee. For example, in its July 31, 2019 consolidated financial statements, Vicentin reported to its lenders, including members of the Steering Committee, that the Company was on sound financial footing.[15] Among other things, Vicentin reported:

- Total non-current assets (e.g., property, plant and equipment, as well as certain investments in joint ventures and associated entities) of more than US$700 million;[16]

- Total current assets (e.g., inventories, trade receivables, other receivables, cash, and cash equivalents) of more than US$1.1 billion;[17]

- Total equity (in excess of reported liabilities) of more than US$600 million;[18] and

- Positive cash flow from operating activities, resulting in a profit of millions of dollars in the preceding quarter for the Company's controlling shareholders.[19]

---

[13] *See, e.g.,* Jorge Declaration Exhibit C § 5.03(i).

[14] *See, e.g.,* Jorge Declaration Exhibit C § 5.03(g).

[15] In preparing and submitting its unaudited financials, the Company expressly noted that "[t]hese consolidated financial statement [sic] are issued to be used by financial institutions, in particular by [FMO], [Rabobank], [IFC], Amerra Capital Management, LLC., [ING], Sumitomo Mitsui Banking Corporation and The Bank of Tokyo – Mitsubishi UFJ. LTD. [(n/k/a MUFG Bank, Ltd.)], in compliance with the financing agreements entered into with them." *See* Jorge Declaration Exhibit I, at n. 3.

[16] *See* Jorge Declaration Exhibit I.

[17] *See* Jorge Declaration Exhibit I.

[18] *See* Jorge Declaration Exhibit I.

[19] *See* Jorge Declaration Exhibit I.

Moreover, the Company reported only minimal non-current trade and other payables, consisting of a mere US$675,000 in respect of external client advances.[20]  Current payables to its raw material suppliers were likewise relatively low in the context of an enterprise of Vicentin's scope—only slightly more than US$10 million was reported to be owed to suppliers of raw materials.[21]  Indeed, Vicentin specifically reported that "the Company complied with all the covenants established in the long-term loan agreements" referenced in the financial statements.[22]

Between releasing its July 31, 2019 financial statements, when it reported a strong balance sheet, minimal outstanding trade payables, and full covenant compliance, and December 2019, Vicentin failed to advise the members of the Steering Committee of any change in the Company's financial position.

Then, on December 5, 2019, just four months after the release of its financial statements and without warning to its lenders, Vicentin publicly announced that it was "under financial stress."  Public information revealed that, in addition to its acknowledged financial indebtedness, the Company had accumulated approximately *US$400 million* in overdue payments owed to its suppliers.  As a result of this arrearage, suppliers evidently ceased shipping any raw material grains to the Company, forcing a halt to operations.   Subsequently, on December 13, 2019, Vicentin suspended its crushing operations pending debt restructuring talks.

Moreover, although various covenants in the SteerCo Facilities prohibited Vicentin and its subsidiaries from selling assets other than in the ordinary course of business (subject to certain limited, and inapplicable, exceptions for transactions under US$5 million),[23] public information

---

[20]   *See* Jorge Declaration Exhibit I. at 19, n. 18.

[21]   *See* Jorge Declaration Exhibit I. at 19, n. 18.

[22]   *See* Jorge Declaration Exhibit I at 18, n. 17(a).

[23]   *See, e.g.,* Jorge Declaration Exhibit C § 5.02(r).

revealed that, mere days before Vicentin halted operations, the Company sold a 16.67% stake (the one indirectly held through Vicentin Paraguay S.A.) in Renova to Glencore in an effort to raise cash.  As a result of that impermissible transaction, Vicentin's stake in Renova (directly and indirectly) was reduced to approximately 1/3 ownership, while Glencore's ownership interest increased to approximately 2/3.  It appears that Vicentin received over US$122 million from the transaction, but it is unclear what became of those sale proceeds.

In response to these events, the Steering Committee was organized and members of the Steering Committee took steps to formally declare events of default under the SteerCo Facilities and to accelerate payment on the balance of the SteerCo Facilities.

Following its organization, the Steering Committee contacted the Company and its advisors in an attempt to initiate a dialogue.[24]  In particular, the members of the Steering Committee were eager to understand how, exactly, the Company went—in a matter of months—from reporting to the lenders that it was flush with cash, inventory, and receivables to declaring that it was without inventory or receivables, that it was, to the contrary, massively in arrears on inventory payables and unable to continue operations.  Although the Company has communicated with the Steering Committee, the Company's explanations as to how, why, or when it became insolvent continue to be elusive and imprecise. The Company also failed to provide any realistic plan for resuming operations given its apparent lack of working capital.

Against that backdrop, various creditors began seeking enforcement or protective measures.  There are also reports that a criminal complaint has been filed against, among others, several Vicentin executives with respect to the Company's recent conduct.

---

[24]  *See* Jorge Declaration Exhibit J.

On February 6, 2020, one of the Company's trade creditors submitted a *quiebra* request—a type of involuntary bankruptcy proceeding—against Vicentin in Argentina. As a matter of Argentine law, Vicentin had only a short period of time to obtain dismissal of the proceeding or to commence its *concurso preventivo*, which is a form of in-court restructuring process.

On February 10, 2020, Vicentin formally commenced its *concurso preventivo* before the Civil and Commercial Court N° 4 of the City of Reconquista, Santa Fe Province, Argentina.[25] Reconquista is a small jurisdiction (around 100,000 inhabitants) where Vicentin has always played a crucial economic role. Courts in Reconquista are rarely confronted with complex economic and financial issues.

A *concurso preventivo* proceeding allows a company to prevent its involuntary bankruptcy and to seek an agreement with its creditors. While the court will appoint an administrator (*síndico*) and a creditors' surveillance committee (which is roughly analogous to a creditors' committee in the context of a U.S. Chapter 11 bankruptcy), the management of the company remains in place.

Partially as a result of the COVID-19 crisis, Vicentin's *concurso preventivo* proceedings have proceeded at a slow pace. However, the court has appointed the *síndico* and the formal creditors' surveillance committee. Two members of the Steering Committee—IFC and FMO—were appointed to the creditors' surveillance committee. In that capacity, IFC and FMO will act to attempt to uncover the reasons for Vicentin's unexplained collapse. In making this Application, however, IFC and FMO are acting in their capacities as lenders and not as members of the creditors' surveillance committee.

On June 8, 2020, the President of the Republic of Argentina publicly announced the Argentine state's intention to expropriate Vicentin and issued an executive order

---

[25] *See* Jorge Declaration Exhibit M.

appointing interim intervenors for the Company, effectively displacing the Company's board of directors. As no appropriate bill has yet been submitted to the Argentine legislature, the current scope of the intended expropriation is still unclear. The Argentine government has, however, noted the substantial claims of both domestic and foreign creditors against the company, and expressly acknowledged the claims of certain members of the Steering Committee.[26] The Argentine government also specifically noted that Vicentin Paraguay's abrupt sale of its Renova shares meant that Vicentin "lost control of a strategic company within the economic group."[27] On June 19, 2020, the Argentine Court, by means of an injunction and for an initial period of 60 days reinstated the former Board of Directors of Vicentin in their capacities and provided that the intervenors would act as controllers (*veedor*) but not as intervenors for the company.

## V.    The Steering Committee's Discovery Efforts and What has Been Learned So Far

This is the second application for judicial assistance submitted by the Steering Committee. It is aimed squarely on building on the valuable information already gleaned from the records produced in response to the Steering Committee's discovery efforts.

On February 14, 2020, the Steering Committee filed its first *Ex Parte Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782* (the "First Application"). Through the First Application, the Steering Committee sought from a standard list of banks that regularly act as financial intermediaries evidence of wire transfers naming Vicentin, certain Vicentin subsidiaries, and certain individuals known to own and/or control Vicentin. On February 18, 2020, the Court granted the First Application and the Steering Committee promptly served subpoenas on the

---

[26]   *See* Jorge Declaration Exhibit Q at 2.

[27]   *Id*. at 1-2.

financial institutions in question.  In addition, as required by the Court's order, the Steering Committee delivered copies of the order and the subpoenas to Vicentin and the Vicentin-affiliated entities and individuals as to which information was sought.

The records produced in response to the subpoenas, although far from a complete picture of Vicentin's financial dealings, reflect a number of troubling facts.

First, there does not appear to be any activity that could legitimately "bridge the gap" between Vicentin's financial position as it was represented in its third quarter financial statements and it collapse in December 2019.

Second, the data the Steering Committee has uncovered so far reveals numerous instances in which Vicentin and its subsidiaries have transferred large sums of cash to the entities controlled by, or otherwise seemingly connected to, the Vicentin Family Group in which Vicentin itself has no material interest and from which Vicentin has been financially separate since at least 2017. Based on the data in the Steering Committee's possession so far—which reflects only a fraction of the total transactions involving Vicentin and other companies controlled by the Vicentin family—it appears that Vicentin (including its Uruguayan branch) transferred approximately **US$400 million on a net basis** to or for the benefit of entities controlled by, or connected to, Vicentin Family Group in which Vicentin itself has no material interest.  Major net recipients of cash include:

- Industrias Agrolimentarias Latam S.A. ("IA Latam"), a company organized in Uruguay.  According to the Argentine Competition Authority (*Comisión Nacional de Defensa de la Competencia*), at least as of September 2018, IA Latam was 100 percent owned by Vicentin Family Group, which is believed to be owned (as its name suggests) by members of the families that control Vicentin.  María Carla Buyatti (a member of one of these families) serves as IA Latam's Argentine legal representative. IA Latam's precise role within the family of entities owned or controlled by the Vicentin family is unclear, but it is **not** a subsidiary (direct or indirect) of Vicentin itself.

14

- Vicentin Family Group Inversiones y Actividades Especiales S.A., a company organized in Uruguay ("Vicentin Family Special Investments"). Vicentin Family Special Investments is owned by Vicentin Family Group. In this sense, Vicentin Family Special Investments is a "sister" company of Vicentin and its subsidiaries, with common ultimate ownership but—in theory at least—entirely separate businesses and finances. Vicentin Family Special Investments appears to have been created by members of the families that control Vicentin to invest in various "special situations" outside of the primary Vicentin business. Following the 2017 reorganization of the Vicentin family's businesses in 2017, Vicentin Family Special Investments became the owner of the cotton, meat, dairy, and wine business.

- Nacadie Comercial S.A., a company organized in Uruguay ("Nacadie"). Nacadie appears to be involved in the cotton and meat business of the Vicentin family. Its ownership structure, however, is currently unclear. Certain filings with the US Securities and Exchange Commission indicate that, in the past, Nacadie was a borrower under certain debt instruments that were guaranteed by Vicentin and benefited two entities controlled by the Vicentin Family Group: Algodonera Avellaneda and Frigorifico Regional Industrias Agroalimentarias Reconquista SA ("FRIAR"), a cotton and meat package businesses respectively. In addition, Nacadie has been described in certain court and regulatory filings as "part of the Vicentin Group." Curiously, Nacadie does not appear on any Vicentin or Vicentin Family Group organizational charts.

- FRIAR, a company organized in Argentina. FRIAR is involved in the Vicentin Family Group's meat business. FRIAR is 99.6 percent owned by Vicentin Family Special Investments, with the remaining 0.4 percent ownership interest held by Vicentin.

While some of the transfers taking place in 2017 might arguably have been a legitimate component of concluding the 2014-2017 reorganization of the Vicentin family's business and the resulting separation between Vicentin and the other enterprises controlled by Vicentin's shareholders, there is no apparent justification for the overwhelming majority of the transfers. On the contrary, an unauthorized use of the loans obtained from the Steering Committee (*e.g.*, financing the expansion of unrelated businesses without consideration) may give rise to a criminal investigation for fraud under Argentine law.

In addition to the above troubling facts, the Steering Committee's discovery efforts to date have uncovered additional potential sources of information. In particular, as a result of financial records produced by various financial institutions in response to the First Application, the Steering Committee has identified a number of intermediary financial institutions that processed

transactions for Vicentin and its affiliates, but which were not themselves asked to produce records in response to the First Application. Among these, Standard Chartered Bank, in particular, stands out as an institution that processed a relatively high volume of transactions as an intermediary (more than US$65 million of transfers identified already based on the records of other financial institutions), was not asked to produce records in response to the First Application, and has sufficient contacts in this District. In addition, the Steering Committee has now identified specific bank accounts held by Vicentin and certain of its known affiliates at the Account Banks, and which were either the originating or beneficiary accounts for wire transfers that cleared through this District.[28]

Now that the Steering Committee has identified these substantial transfers of funds, it needs to find out what happened next. Did the other enterprises controlled by the Vicentin family apply the funds for their own benefit? Did they transfer them to still other vehicles controlled by the Vicentin family? Did they do something else entirely with the funds? The Steering Committee has identified what appears to be improperly transferred funds: it now asks this Court for assistance in helping it follow those transfers to their end recipients.

## NATURE OF EVIDENCE SOUGHT AND RELIEF REQUESTED

As set forth with more specificity in the sample subpoenas attached to the Application as Exhibits A, B, C, and D the Steering Committee seeks additional financial information relating to Vicentin, certain Vicentin subsidiaries, and certain individuals known to own and/or control Vicentin.[29] The information sought by the Steering Committee falls into three categories. First,

---

[28]  *See* Jorge Declaration Exhibit O.

[29]  Application Exhibit A is a proposed form of subpoena to be directed to the Clearing House seeking production of wire transfer information. Application Exhibit B is a proposed form of subpoena to be directed to all Inter`mediary Institutions with the exception of the Clearing House and Standard Chartered Bank seeking production of wire transfer information.

the Steering Committee seeks, from the Intermediary Institutions, wire transfer records reflecting activity by certain known or suspected affiliates of Vicentin that were not addressed in the First Application that are now known to have received substantial suspect transfers from Vicentin. Second, with respect to Standard Chartered Bank, the Steering Committee seeks the above information, as well as the types of wire transfer records already produced by the other Intermediary Institutions pursuant to the First Application.  Finally, the Steering Committee seeks information from the Account Banks related to certain specific bank accounts that have been identified as being held by Vicentin and certain of its known affiliates with institutions that have sufficient contacts with this District.

## ARGUMENT

## I.    Standard for Granting Relief

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  Section 1782 "provide[s] for assistance in obtaining documentary and other tangible evidence as well as testimony."  *Id.* at 248.  The statute provides, in relevant part, that:

> [t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may

---

Application Exhibit C is a proposed form of subpoena to be directed to Standard Chartered Bank seeking production of wire transfer information seeking to be directed to the Intermediary Institutions.  Exhibit D is a proposed form of subpoena to be directed to the Account Banks seeking production of records in respect of certain identified bank accounts.

> direct that the testimony or statement be given, or the document or
> other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

Courts considering requests for relief under Section 1782 have recognized that the statute contains threshold mandatory requirements for obtaining relief, as well as discretionary elements. First, with respect to the mandatory requirements:

> A district court has authority to grant a § 1782 request where: (1) the
> person from whom discovery is sought resides (or is found) in the
> district of the district court to which the application is made, (2) the
> discovery is for use in a proceeding before a foreign or international
> tribunal, and (3) the application is made by a foreign or international
> tribunal or any interested person.

*Mees v Buiter*, 793 F.3d 291, 297 (2d Cir. 2015)(internal quotations omitted); *see Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 460 (2d Cir. 2014); *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6, 8 (2d Cir. 2014).

Once it has been established that an application meets the mandatory requirements for granting discovery, the district court has discretion as to whether and, to what extent, to approve the request. *See Mees*, 793 F.3d at 297. The Supreme Court has provided guidance as to the factors that should be considered by a court in deciding how to exercise its discretion:

- Discovery is more likely to be appropriate where the discovery target is ***not*** a party to the foreign proceeding;

- The court may consider the character of the foreign proceedings and whether the foreign tribunal would be receptive to assistance from U.S. federal courts;

- Discovery may be inappropriate if the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States"; and

- "unduly intrusive or burdensome requests may be rejected or trimmed."

*Intel*, 542 U.S. at 264-65; *see also Mees*, 793 F.3d at 298 (reciting four factors).

18

In this instance, discovery should be awarded because the Steering Committee's Application satisfies each of the mandatory requirements and is also supported by the discretionary factors.

## II.     The Steering Committee's Application Meets all of the Statutory Requirements for Discovery Pursuant to 28 U.S.C. § 1782

### A.     The Respondent Institutions Reside or Can be Found in this District

In order to be subject to discovery under Section 1782, an entity must either reside or be found in the District. *See* 28 U.S.C. § 1782. In determining whether that standard is met, the Second Circuit has emphasized that "[c]ourts have consistently given broad interpretations to similar 'found' language in other statutes." *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019). Moreover, the Second Circuit has "repeatedly recognized Congress's intent that § 1782 be 'interpreted broadly….'" *Id.* (citing *In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)). Accordingly, the requirement that a party "resides or is found" in a District in order to be subject to discovery under Section 1782 is given maximum possible breadth, and "extends to the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d at 528.

At a minimum, a legal entity resides or is found in a jurisdiction when it is headquartered or incorporated there—meaning that it is subject to general personal jurisdiction in that District. *See, e.g., In re Godfrey,* 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007); *In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006) ("McKinsey maintains its headquarters in New York, and thus is 'found' within this district.").

However, in emphasizing the breadth of Section 1782's availability, the Second Circuit recently expressly rejected the contention that an entity is ***only*** found in a District if it is

incorporated or headquartered there.  *See In re del Valle Ruiz*, 939 F.3d at 527 ("[O]ur focus on

tag jurisdiction comporting with due process in no way suggests that § 1782's reach should be

coextensive only with the limits of a district court's *general* jurisdiction.").  To the contrary,

Section 1782 discovery can likewise be founded on specific personal jurisdiction.  *See id.* at 528-

29.  "For specific jurisdiction, there must be an affiliation between the forum and the underlying

controversy, principally, [an] activity or an occurrence that takes place in the forum State."  *Id.* at

529 (*quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017)

(internal quotation marks omitted).

In this instance, the Clearing House and all of the other Respondent Institutions are subject

to either this Court's general or specific personal jurisdiction.  The first Respondent, the Clearing

House, is subject to this Court's general personal jurisdiction, and is thus found in this District for

purposes of Section 1782, because it maintains its headquarters at 1114 Avenue of the Americas,

17th Floor, New York, NY 100036.  A number of the other Respondent Institutions—all of which

are large banks or similar financial institutions—are likewise headquartered in this District.

Complete details of the locations of the Intermediary Institutions' respective headquarters are set

forth on Exhibit A to the Jorge Declaration.  Complete details of the locations of the Account

Banks' respective headquarters are set forth on Exhibit P to the Jorge Declaration.

The remainder of the Respondent Institutions are "found" in this District for purposes of

Section 1782 because they are subject to this Court's specific personal jurisdiction.  As an initial

matter, each of the Respondent Institutions has purposefully availed itself of this forum by

maintaining one or more branches in this District.[30]

---

[30]   *See* Jorge Declaration Exhibits A, P.

More important for purposes of the Application, however, each of the Intermediary Institutions consistently transacts business in this District by acting as an intermediary or correspondent bank in connection with US dollar-denominated transactions. As a matter of the structure of the international financial system, these intermediary transactions generally clear through this District. In particular, each of the Intermediary Institutions (with the exceptions of the Clearing House itself) is one of the very few institutions worldwide that has taken the necessary steps to become a direct participant in the Clearing House Interbank Payments System ("CHIPS"). CHIPS is operated by the Clearing House through this District, and is the largest private sector US dollar clearing system in the world, clearing and settling approximately US$1.5 trillion in domestic and international payments per day. All transfers processed through CHIPS clear through this District, where CHIPS is located. As New York courts have explained:

> Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the CHIPS. The CHIPS network handles 95% of the international transfers made in dollars…. These funds are transferred through participating banks located in New York…. As a result, this State is considered the national and international center for wholesale wire transfers.

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (internal citations omitted); *see also Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (2014) ("Indeed, the parties here agree that, as a practical matter, any dollar transaction comparable in size to the one now at issue must go through New York.").

This is critical because the overwhelming majority of Vicentin's revenues—more than 90% based on the most recently available figures—were derived from dollar-denominated exports.[31]

---

[31] *See* Jorge Declaration ¶ 16.

Indeed, the Company has expressly treated US dollars as its functional currency.[32]  Consequently, a large portion of Vicentin's transactions will have been processed in this District by institutions such as the Intermediary Institutions.  The information sought by the Steering Committee through the Application relates directly to the business transacted by each of the Intermediary Institutions in this district—records of transfers denominated in US dollars that cleared through CHIPS, its public sector counterpart (Fedwire), or similar systems.

Finally, each of the Account Banks is "found" in the district because they maintain one or more branches in this District[33] and/or maintain accounts on behalf of the relevant Vicentin-affiliated entities in this District.[34]  Indeed, Vicentin and certain of its affiliates are known to have received substantial wire transfers through accounts held at the Account Banks.  For example, accounts at Itau Unibanco S.A., New York Branch were used for certain funding wires in respect of the SteerCo Facilities.

Accordingly, the first mandatory requirement for the approval of discovery under Section 1782 is satisfied.

B.      The Discovery Sought is for Use in a Proceeding Before a Foreign Tribunal

Courts in this District have repeatedly affirmed that "[w]hether discovery is 'for use in a foreign proceeding' is afforded broad interpretation."  *Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD)(SN), 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018).  An applicant need not show that the material would be admissible in a particular foreign proceeding.  *See Brandi–Dohrn*, 673 F.3d at 82.  To the contrary, the foreign proceeding need not even yet be under way,

---

[32]   *See id.*

[33]   *See* Jorge Declaration Exhibit P.

[34]   *See* Jorge Declaration ¶ 23; Jorge Declaration Exhibit O.

so long as it is "within reasonable contemplation." *Intel*, 542 U.S. at 259.  An action is within reasonable contemplation if there is "'some objective indicium' or 'some concrete basis' of petitioners' intent to initiate a foreign proceeding." *In re Top Matrix Holdings Ltd.,* No. 18 MISC. 465 (ER), 2020 WL 248716, at \*4 (S.D.N.Y. Jan. 16, 2020) (quoting *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123–24 (2d. Cir. 2015)).

At a minimum, the Steering Committee anticipates using the information sought through the Application in connection with Vicentin's pending *concurso preventivo* proceedings.[35]  As described in further detail in the Jorge Declaration, a *concurso preventivo* is an Argentinian in-court insolvency and restructuring proceeding.[36]  Such restructuring proceedings satisfy Section 1782's foreign proceeding requirement.  *See Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) ("A bankruptcy proceeding . . . is within the intended scope of § 1782.").  Indeed, the information sought by the Steering Committee, which consists entirely of financial records that will allow creditors to trace Vicentin's dissipated assets, will be enormously helpful in those *concurso preventivo* proceedings.[37]

Moreover, additional foreign proceedings are within reasonable contemplation.  The Steering Committee intends to take action in Argentina to hold accountable Vicentin and any other parties that were responsible for, or benefitted from, the dissipation or improper overstatement of Vicentin's assets.[38]  That contemplated action meets the statutory requirement, which only requires that a party seeking discovery "present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain*

---

[35]   *See* Jorge Declaration ¶¶ 46, 52.

[36]   *See id.* ¶¶ 3, 35.

[37]   *See* Jorge Declaration ¶ 53.

[38]   *See id.*

*Funds, Accounts and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Group*, 798 F.3d at 124.

As an initial matter, "sworn statements attesting to petitioners' intent to litigate and describing the legal theories on which they plan to rely are sufficiently concrete to meet the statutory requirement." *In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *4 (*citing In re Hornbeam Corp.*, 722 F. App'x 7, 9–10 (2d Cir. 2018)).  Moreover, the already developed facts provide sufficiently concrete support for impending litigation.  There is no question that, as of July 31, 2019, the Company represented to members of the Steering Committee that it had ample working capital assets, positive cash flow, was in compliance with its loan covenants, and, perhaps most critically, had minimal outstanding debt to its trade creditors (approximately US$11 million to raw material suppliers).  And there is no question that, as of December 2019, the Company abruptly shut down, indicated that it had no material working capital assets, and had been struggling for so long that it accumulated approximately ***US$350 million*** in supplier arrearages in addition to its financial debt.  It is clear that there was hundreds of millions of dollars of wrongdoing here—the requested discovery is simply needed to prove exactly where the money went.  *See In re Sargeant*, 278 F. Supp. 3d 814, 822 (S.D.N.Y. 2017) (holding that discovery sought to trace assets likely satisfied the second requirement).  Accordingly, the second mandatory requirement is satisfied.

C.  The Members of the Steering Committee are
     <u>"Interested Parties" for Purposes of 28 U.S.C. § 1782</u>

A person who has a "participation right" and "possesses a reasonable interest in obtaining judicial assistance . . . qualifies as an interest person within any fair construction of that term." *Intel*, 542 U.S. at 256-57 (internal citations omitted).  Moreover, the "legislative history to § 1782

makes plain that 'interested person' includes a party to the foreign litigation." *Lancaster*, 90 F.3d at 42 (internal citations omitted).

As a matter of Argentine law, the members of the Steering Committee have full participation rights in Vicentin's *concurso preventivo* proceedings, with standing to be heard, submit objections, vote on any proposed restructuring, and take similar actions.[39]  In addition, as Vicentin's largest creditor constituency, the members of the Steering Committee have standing to seek enforcement of their rights under the SteerCo Facilities against Vicentin and other parties that may have participated in the apparent dissipation of Vicentin's assets.[40]  In addition, two members of the Steering Committee—IFC and FMO—have been appointed in the *concurso preventivo* as members of the Creditors' Surveillance Committee—in which capacity they will have broad authority to advise the Argentine court and the *syndic* and to continue to act to uncover the reasons for Vicentin's unexplained collapse.[41]  Accordingly, the Application satisfies the third mandatory requirement for approval of discovery under Section 1782.

## III.   **The Relevant Discretionary Factors also Weigh in Favor of Granting Discovery**

As noted above, once the District Court has determined that the mandatory requirements for relief under Section 1782 are met, the Court is free to grant discovery in its discretion. *Optimal Inv. Servs., S.A.*, 773 F.3d at 460.  Here, the Court should award discovery because all of the discretionary factors likewise support discovery.

First, none of the Respondent Institutions are parties to, or are anticipated to be parties to, any of the contemplated proceedings in Argentina.[42]  To the contrary, the Respondent Institutions

---

[39]   *See* Jorge Declaration ¶ 54.

[40]   *See id.* ¶ 55.

[41]   *See id.* ¶¶ 38, 56.

[42]   *See* Jorge Declaration ¶ 58.

are simply international financial institutions that, to the Steering Committee's knowledge, had no role in any wrongdoing by Vicentin beyond potentially engaging in routine processing of US dollar-denominated transfers. Accordingly, the first factor weighs in favor of granting the Application. *See Intel*, 542 U.S. at 264 ("[T]he need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

Second, the Argentine Court would likely be receptive to any information uncovered through discovery as to the transfers made by Vicentin and its affiliated entities and individuals.[43] Indeed, courts in this District have, on multiple occasions, approved similar intermediary bank discovery under Section 1782 in order to make such information available to Argentine courts. *See, e.g., In re Application of Maria Ester Tabak*, No. 18-mc-00221 (PGG) (S.D.N.Y. July 1, 2018) ("[T]here is no indication that the Argentine court would not be receptive to U.S. federal-court judicial assistance as requested in the Application.").

Third, the Application does not circumvent any existing or anticipated evidence gathering restrictions imposed in Argentina. The Steering Committee's Argentine counsel has advised that the evidence sought through the Application would likely be admissible in an Argentine court overseeing Vicentin's *concurso preventivo* proceeding or other litigation against Vicentin and its affiliated entities or individuals.[44]

Finally, the Application is not unduly intrusive or burdensome. The proposed requests to the Respondent Institutions, as reflected in the sample subpoenas attached to the Application as Exhibit A, B, C, and D, are limited to the type of information that the Respondent Institutions

---

[43]   *See* Jorge Declaration ¶ 59.

[44]   *See* Jorge Declaration ¶ 60.

regularly maintain and produce to third parties or actual parties in litigation.[45]   Courts in this District have recognized that similar requests to intermediary banks and the Clearing House impose only a "minimal burden" and have accordingly approved discovery.  *See, e.g., In re Application of Fernando Celso De Aquino Chad*, No. 19-mc-261, 2019 WL 2502060, at *4, (S.D.N.Y. June 27, 2019); *see also In re Iraq Telecom Ltd.*, No. 18-MC-458 (LGS) (OTW), 2019 WL 3798059, at *5 (S.D.N.Y. Aug. 13, 2019) (authorizing 1782 discovery and concluding that subpoenas seeking information regarding intermediary bank activity and specified bank accounts was not unduly burdensome); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *15 (S.D. Fla. June 12, 2012) (authorizing pursuant to Section 1782 subpoenas related to eight specific bank accounts and concluding there was "no basis on which to find that the proposed subpoena is either intrusive or burdensome").

Accordingly, each discretionary factor identified by the *Intel* Court weighs in favor of granting the Application.

## CONCLUSION

WHEREFORE, the Steering Committee respectfully requests this Court enter an Order, substantially in the form submitted herewith:

1.      Granting the Steering Committee's Application for discovery from the Respondent Institutions pursuant to 28 U.S.C. § 1782;

2.      Authorizing the Steering Committee to take discovery from the Respondent Institutions relating to the issues identified in its Application, including: (a) issuing subpoenas for production of documents by the Respondent Institutions in substantially the forms attached to the Application as Exhibits A, B, C, and D, as applicable; and (b) issuing additional subpoenas for the

---

[45]    *See* Jorge Declaration ¶ 61.

27

production of documents as the Steering Committee may reasonably deem appropriate and as are consistent with the Federal Rules of Civil Procedures;

3.      Directing the Respondent Institutions to comply with such subpoenas in accordance with the Federal Rules of Civil Procedures and the Rules of this Court;

4.      Appointing the Steering Committee's counsel to issue, sign, and serve such subpoenas upon the Respondent Institutions;

5.      Ordering the Steering Committee to deliver copies of the Order and any subpoenas issued pursuant to the Order to Vicentin and those Vicentin-affiliated entities and individuals as to which information is sought; and

6.      Granting such other and further relief as is just and proper.


Dated: June 29, 2020
       New York, New York

                                        **NORTON ROSE FULBRIGHT US LLP**

                                        By:    /s/ Thomas J. Hall
                                               Thomas J. Hall
                                               Howard S. Beltzer
                                               Eric Daucher
                                               1301 Avenue of the Americas
                                               New York, New York 10019-6022
                                               Telephone: (212) 318-3000
                                               Facsimile: (212) 408-5100
                                               Email:  thomas.hall@nortonrosefulbright.com
                                                       howard.beltzer@nortonrosefulbright.com
                                                       eric.daucher@nortonrosefulbright.com

                                        *Counsel for Applicant The Steering Committee*